# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2023AP2020-OA |

| | |
|---|---|
| COMPLETE TITLE: | Tony Evers Governor of Wisconsin, Department of Natural Resources, Board of Regents of the University of Wisconsin System, Department of Safety and Professional Services and Marriage and Family Therapy Board Professional Counseling and Social Work Examining Board, <br>        Petitioners, <br>Gathering Waters, Inc., <br>        Intervenor-Petitioner, <br>     v. <br>Senator Howard Marklein, Representative Mark Born in their official capacities as chairs of the joint committee on finance, Senator Chris Kapenga, Representative Robin Vos in their official capacities as chairs of the joint committee on employment relations, Senator Steve Nass and Representative Adam Neylon in their official capacities as co-chairs of the joint committee for review of administrative rules, <br>        Respondents, <br>Wisconsin Legislature, <br>        Intervenor-Respondent. |

ORIGINAL ACTION

| | |
|---|---|
| OPINION FILED: | July 5, 2024 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | April 17, 2024 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | |
|   COUNTY: | |
|   JUDGE: | |

| | |
|---|---|
| JUSTICES: | |

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, HAGEDORN, KAROFSKY, and PROTASWIECZ, JJ., joined. ANN WALSH BRADLEY, J., filed a concurring opinion, in which DALLET and PROTASWIECZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY, KAROFSKY, and PROTASWIECZ, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion.

NOT PARTICIPATING:

---

ATTORNEYS:

For the petitioners, there were briefs filed by *Charlotte Gibson*, assistant attorney general, *Colin T. Roth*, assistant attorney general, with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Colin T. Roth*, assistant attorney general.

For the intervenor-petitioner, there were briefs filed by *Erin K. Deeley*, *Jeffrey A. Mandell*, *Rachel E. Snyder*, *Carly Gerads*, and *Stafford Rosenbaum LLP, Madison*. There was an oral argument by *Erin K. Deeley*.

For the respondents and intervenor-respondent, there was a brief filed by *Misha Tseytlin*, *Sean T.H. Dutton*, *Kevin M. LeRoy*, and *Troutman Pepper Hamilton Sanders LLP, Chicago, IL*. There was an oral argument by *Misha Tseytlin*.

An amicus curiae brief was filed by *Evan Feinauer*, *Brett Korte*, *David Tipson*, and *Clean Wisconsin, Madison*, on behalf of Clean Wisconsin.

An amicus curiae brief was filed by *Chris Donahoe*, *Daniel S. Lenz*, *T.R. Edwards*, and *Law Forward, Inc., Madison*, on behalf of Former Wisconsin Judges.

An amicus curiae brief was filed by *Tony Wilkin Gibart*, *Robert D. Lee*, and *Midwest Environmental Advocates, Madison*, on behalf of Save our Water and Wisconsin Conservation Voters.

An amicus curiae brief was filed by *Bryna Godar*, *Miriam Seifter*, and *State Democracy Research Initiative, University of Wisconsin Law School, Madison*, on behalf of Legal Scholars.

An amicus curiae brief was filed by *Richard M. Esenberg*, *Lucas T. Vebber*, *Skylar Croy*, and *Wisconsin Institute for Law & Liberty, Inc., Milwaukee*, on behalf of Wisconsin Institute for Law & Liberty, Inc.

**2024 WI 31**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No.   2023AP2020-OA

STATE OF WISCONSIN                    :        IN SUPREME COURT

Tony Evers Governor of Wisconsin, Department of Natural Resources, Board of Regents of the University of Wisconsin System, Department of Safety and Professional Services and Marriage and Family Therapy Board Professional Counseling and Social Work Examining Board,

       Petitioners,

Gathering Waters, Inc.,

       Intervenor-Petitioner,

  v.

Senator Howard Marklein, Representative Mark Born in their official capacities as chairs of the joint committee on finance, Senator Chris Kapenga, Representative Robin Vos in their official capacities as chairs of the joint committee on employment relations, Senator Steve Nass and Representative Adam Neylon in their official capacities as co-chairs of the joint committee for review of administrative rules,

       Respondents,

Wisconsin Legislature,

       Intervenor-Respondent.

**FILED**

**JUL 5, 2024**

Samuel A. Christensen
Clerk of Supreme Court

REBECCA GRASSL BRADLEY, J., delivered the majority opinion of the Court, in which ANN WALSH BRADLEY, DALLET, HAGEDORN, KAROFSKY, and PROTASWIECZ, JJ., joined. ANN WALSH BRADLEY, J., filed a concurring opinion, in which DALLET and PROTASWIECZ, JJ., joined. REBECCA GRASSL BRADLEY, J., filed a concurring opinion. DALLET, J., filed a concurring opinion, in which ANN WALSH BRADLEY, KAROFSKY, and PROTASWIECZ, JJ., joined. ZIEGLER, C.J., filed a dissenting opinion.

ORIGINAL ACTION. *Rights declared.*

¶1 REBECCA GRASSL BRADLEY, J. The Wisconsin Constitution vests each of the three branches of government with separate and distinct powers. When one branch challenges the exercise of power by another, the judiciary must ensure constitutional boundaries have not been breached. Safeguarding the structural separation of powers prevents one branch from encroaching upon or seizing the powers of another, averting "'a gradual concentration of the several powers in the same department.'" Gabler v. Crime Victims Rts. Bd., 2017 WI 67, ¶7, 376 Wis. 2d 147, 897 N.W.2d 384 (quoting The Federalist No. 51, at 318-19 (James Madison) (Clinton Rossiter ed., 1961)). The "preservation of liberty requires that the three great departments of power should be separate and distinct." The Federalist No. 47, at 324 (James Madison) (J. Cooke ed., 1961).

¶2 In this case, the petitioners[1] claim the legislature has impermissibly intruded upon the executive branch's core power to

---

[1] This original action was brought by the attorney general on behalf of Governor Tony Evers, the Department of Natural Resources ("DNR"), the Board of Regents for the University of Wisconsin, the

execute the law by authorizing a legislative committee to halt expenditures for land conservation measures after the legislature already appropriated the money through the budget process. The legislative respondents[2] defend the statutes based on the legislature's interest in overseeing the executive branch's expenditure of state funds. We hold that Wis. Stat. §§ 23.0917(6m) and 23.0917(8)(g)3. (2021-22)[3] unconstitutionally authorize the legislative branch to arrogate and impede the executive's core power to execute the law, violating the separation of powers structurally enshrined in our constitution.

## I. BACKGROUND

¶3 In 1989, the legislature created the Knowles-Nelson Stewardship Program ("the Program") "to acquire land to expand nature-based outdoor recreational opportunities and protect environmentally sensitive areas." Eric Helper, Warren Knowles-Gaylord Nelson Stewardship Program, Wis. Legis. Fiscal Bureau, Informational Paper #66, 1 (Jan. 2023); 1989 Wis. Act 31, § 650fq. The Program allows the Department of Natural Resources ("DNR") to

---

Department of Safety and Professional Services, and the Marriage and Family Therapy, Professional Counseling, and Social Work Examining Board. After we granted the original action petition, we granted Gathering Waters, Inc.'s motion to intervene as a petitioner.

[2] The legislative respondents are Senators Howard Marklein, Chris Kapenga, and Steve Nass, and Representatives Mark Born, Robin Vos, and Adam Neylon, each named in his official capacity. After we granted the original action petition, we granted the Wisconsin Legislature's motion to intervene as a respondent.

[3] All subsequent references to the Wisconsin Statutes are to the 2021-22 version unless otherwise indicated.

3

purchase land or disburse state funds to local governments and nonprofit organizations to acquire land for nature-based outdoor recreation. Land acquired under the Program must remain accessible to the public unless public safety or environmental concerns counsel against public access. See generally Wis. Stat. § 23.0916. Since its creation, the legislature has reauthorized funding for the Program multiple times, primarily through the biennial budget process. 2021 Wis. Act 58, § 97m. Currently, the legislature has authorized the DNR to obligate up to $33,250,000 in each fiscal year through 2025-26 for land acquisition projects. Wis. Stat. § 20.866(2)(ta).

¶4 To carry out the Program, the DNR reviews applications submitted by local governments and conservation nonprofits to determine whether the requested expenditure fulfills the statutory purposes outlined in Wis. Stat. § 23.09(2)(d) for land acquisition. The DNR also may purchase land under the Program. Wis. Stat. § 23.0917(3)(a). The DNR has promulgated detailed administrative rules to implement and administer the Program, including rules establishing eligibility requirements for proposed projects. See generally Wis. Admin. Code NR § 51. Those rules provide additional guidance for land acquisition proposals. Wis. Admin. Code NR § 1.40.

¶5 In October 2023, the governor filed an original action petition with this court raising three separate but related issues regarding the exercise of legislative review procedures over

4

executive branch actions.[4] We granted review solely with respect to the legislative review provisions governing the Program and held the other two issues in abeyance pending the resolution of this issue.

¶6 The petitioners challenge the constitutionality of Wis. Stat. §§ 23.0917(6m) and (8)(g)3., which allow the Joint Committee on Finance ("JFC")[5] to engage in a review process for certain expenditures under the Program. Specifically, subsection (6m) requires the DNR[6] to notify the members of the JFC if an expenditure under the Program exceeds $250,000.[7] § 23.0917(6m)(c). The statute allows the members of the JFC to review the expenditure

---

[4] Specifically, the petitioners challenged legislative review provisions in Wis. Stat. §§ 23.0917(6m) and 23.0917(8)(g)3., Wis. Stat. § 230.12(3)(e)1., and Wis. Stat. §§ 227.19(5)(c), (d), (dm), and 227.26(2)(d) and (im).

[5] The Joint Committee on Finance has existed in some form since 1911. Its principal function is to serve as the legislative committee reviewing state funding and appropriations, which are generally handled through the biennial budget process. Dave Loppow, Joint Committee on Finance, Wis. Legis. Fiscal Bureau, Informational Paper #81, 1 (Jan. 2023). The committee comprises sixteen legislators, consisting of eight senators and eight representatives to the assembly. Wis. Stat. § 13.09(1). The Senate Majority Leader and the Speaker of the Assembly select committee members.

[6] The legislature created the DNR and placed its supervision within the executive branch under the "the direction and supervision of the natural resources board." Wis. Stat. § 15.34(1).

[7] The review process applies to certain expenditures under $250,000, but a full recitation of its reach is unnecessary because the petitioners facially challenge the legislature's ability to reject the disbursement of appropriated funds.

over a 14-day period and the JFC can temporarily block the expenditure of the funds by the executive branch until the committee holds a meeting on the proposed project. If a meeting is requested by a member of the JFC, the DNR cannot obligate the funds for the project until the committee approves the expenditure. Nothing within the statutory review provisions mandates when the committee must hold a meeting on the expenditure. After a meeting is held, the JFC votes on whether to allow the specific expenditure by the DNR. The JFC's decision is not subject to a vote of the full legislature.

¶7 Subsection (8)(g)3. operates in the same way as subsection (6m) but applies to land acquisition projects "outside of a project boundary" regardless of the amount of the expenditure. Under this subsection, the DNR cannot obligate money for a land acquisition "outside of a project boundary" unless 12 members of the JFC "approve the land acquisition." Wis. Stat. § 23.0917(8)(g)3. The full legislature does not review or vote on the JFC's decision. If the JFC rejects the expenditure, the money cannot be spent on the project. The petitioners allege the JFC has prohibited or delayed a number of the DNR's proposed Program expenditures, thereby affecting the executive branch's ability to effectuate the policy purposes of the Program.

## II. STANDARD OF REVIEW

¶8 The petitioners assert the statutes permitting the JFC to review certain expenditures under the Program are facially unconstitutional because they violate the separation of powers embedded in the Wisconsin Constitution's vesting clauses. In

6

making a facial challenge, petitioners "face a tall task." Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶4, 393 Wis. 2d 38, 946 N.W.2d 35 ("SEIU"). "[T]he challenging party must show that the statute cannot be enforced 'under any circumstances.'" Id., ¶38 (quoted source omitted). The facial challenge to the statutes in this case presents issues of constitutional and statutory interpretation, which are questions of law this court reviews de novo. League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶13, 387 Wis. 2d 511, 929 N.W.2d 209 (citing Milwaukee J. Sentinel v. DOA, 2009 WI 79, ¶14, 319 Wis. 2d 439, 768 N.W.2d 700).

## III. ANALYSIS

¶9 Mirroring the United States Constitution,[8] the Wisconsin Constitution "creates three separate coordinate branches of government," with the understanding that no branch of government can subordinate, control, or exercise the power of another branch. State v. Holmes, 106 Wis. 2d 31, 42, 315 N.W.2d 703 (1981). Each branch is "'vested' with a specific core governmental power." SEIU, 393 Wis. 2d 38, ¶31 (citing Gabler, 376 Wis. 2d 147, ¶11). "The legislative power shall be vested in a senate and assembly"; "The executive power shall be vested in a governor"; and "The

---

[8] As a general principle, the separation of powers framework undergirding the Wisconsin Constitution reflects the principles embodied in the United States Constitution. Gabler v. Crime Victims Rts. Bd., 2017 WI 67, ¶11, 376 Wis. 2d 147, 897 N.W.2d 384; Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶31, 393 Wis. 2d 38, 946 N.W.2d 35 ("SEIU"). We may consult federal sources on the separation of powers because they "inform our understanding of the separation of powers under the Wisconsin Constitution." Gabler, 376 Wis. 2d 147, ¶11.

7

judicial power of this state shall be vested in a unified court system." Wis. Const. art. IV, § 1; id. art. V, § 1; id. art. VII, § 2. Under the dispersion of these powers between the branches, "[e]very positive delegation of power to one officer or department implies a negation of its exercise by any other officer, department or person. If it did not, the whole constitutional fabric might be undermined and destroyed." State v. Hastings, 10 Wis. 468 [*525], 475 [*531] (1860). "By vesting certain powers exclusively within each of the three co-equal branches of government, the drafters of the Wisconsin Constitution recognized the importance of dispersing governmental power in order to protect individual liberty and avoid tyranny." League of Women Voters, 387 Wis. 2d 511, ¶31 (citation omitted).

¶10 Historically, we have recognized "core powers" of each branch and "shared powers" between the branches. SEIU, 393 Wis. 2d 38, ¶35. "Core powers," we have said, "are not for sharing." Tetra Tech EC, Inc. v. DOR, 2018 WI 75, ¶47, 382 Wis. 2d 496, 914 N.W.2d 21 (lead opinion). "There are zones of authority constitutionally established for each branch of government upon which any other branch of government is prohibited from intruding. As to these areas of authority, the unreasonable burden or substantial interference test does not apply: any exercise of authority by another branch of government is unconstitutional." State ex rel. Fiedler v. Wis. Senate, 155 Wis. 2d 94, 100, 454 N.W.2d 770 (1990) (citing In Matter of Complaint Against Grady, 118 Wis. 2d 762, 776, 348 N.W.2d 559 (1984)).

8

¶11 In contrast, shared powers "lie at the intersections of the[] exclusive core constitutional powers." Gabler, 376 Wis. 2d 147, ¶34 (quoting State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999)). Incapable of precise classification, shared powers have been described as "twilight zones" and "ambiguous territory in which the functions of two branches . . . overlap." Holmes, 106 Wis. 2d at 43-44. For example, we have "acknowledged that some legislative actions affecting the courts do not contravene the separation of powers." Gabler, 376 Wis. 2d 147, ¶35. Identifying the core powers of the legislature and the executive branch facilitates our review of the challenged statutes under a separation of powers analysis.

¶12 Article IV, Section 1 of the Wisconsin Constitution vests the "senate and assembly" with the "legislative power" which "'is the authority to make laws, but not to enforce them.'" Koschkee v. Taylor, 2019 WI 76, ¶11, 387 Wis. 2d 552, 929 N.W.2d 600 (quoting Schuette v. Van De Hey, 205 Wis. 2d 475, 480-81, 556 N.W.2d 127 (Ct. App. 1996)). The legislative power encompasses the ability to determine whether there shall be a law, to what extent the law seeks to accomplish a certain goal, and any limitations on the execution of the law. Id.; see also State ex rel. Wis. Inspection Bureau v. Whitman, 196 Wis. 472, 505, 220 N.W. 929 (1928); SEIU, 393 Wis. 2d 38, ¶1 ("Legislative power is the power to make the law, to decide what the law should be."). The legislative power is vast: "it is competent for the legislature to exercise all legislative power not forbidden by the constitution or delegated to the general government, or prohibited

9

by the constitution of the United States. The legislature, subject to a qualified veto of the executive, possesses all the legislative power of the state." Bushnell v. Town of Beloit, 10 Wis. 155 [*195], 168-69 [*225] (1860).

¶13 The procedural requirements of bicameralism and presentment temper the expansive authority vested in the legislative branch to make policy decisions for the state. For a bill to be enacted into law it must pass through both the assembly and the senate and then be presented to the governor for his approval or veto. Wis. Const. art. V, § 10(1)(a) ("Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor."). "A prime reason for bicameralism, modernly considered, is to insure mature and deliberate consideration of, and to prevent precipitate action on, proposed legislative measures." Reynolds v. Sims, 377 U.S. 533, 576 (1964). Bicameralism and presentment thereby cabin the immense power vested in the legislature to enact laws. See Consumer Energy Council of Am. v. FERC, 673 F.2d 425, 464 (D.C. Cir. 1982) (bicameralism and presentment "ultimately serve the same fundamental purpose: to restrict the operation of the legislative power to those policies which meet the approval of three constituencies, or a supermajority of two.").

¶14 Determinations of how to appropriate the state's funds fall squarely within the legislative power. The legislature derives its spending power from Article VIII, Section 2 of the Wisconsin Constitution: "No money shall be paid out of the treasury except in pursuance of an appropriation by law." This

10

provision, combined with Article VIII, Section 5,[9] "empower[s] the legislature . . . to make policy decisions regarding taxing and spending." Flynn v. DOA, 216 Wis. 2d 521, 540, 576 N.W.2d 245 (1998). Controlling the expenditure of state funds through lawmaking constitutes an exercise of the legislature's appropriation authority. See id. at 547; SEIU, 393 Wis. 2d 38, ¶69 ("[T]he constitution gives the legislature the general power to spend the state's money by enacting laws.").

¶15 Article V, Section 1 of the Wisconsin Constitution vests the governor with the "executive power." The governor is entrusted to "take care that the laws be faithfully executed." Wis. Const. art. V, § 4. The executive branch's role is to effectuate the policies passed by the legislature. The "executive, however, is not a legislatively-controlled automaton. Before executing, he must of necessity determine for himself what the law requires him to do." SEIU, 393 Wis. 2d 38, ¶96 (Kelly, J., majority op.).[10] The executive power vested in the governor comprises the ability to determine "what the law requires as well as applying it[.]"

---

[9] Wis. Const. art. VIII, § 5 ("The legislature shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year; and whenever the expenses of any year shall exceed the income, the legislature shall provide for levying a tax for the ensuing year, sufficient, with other sources of income, to pay the deficiency as well as the estimated expenses of such ensuing year.")

[10] In SEIU, there were two majority opinions. Justice Hagedorn authored one majority opinion joined by Chief Justice Roggensack and Justices Annette Ziegler, Rebecca Grassl Bradley, and Daniel Kelly. See SEIU, 393 Wis. 2d 38, ¶6. Justice Kelly authored a separate majority opinion joined by Justices Ann Walsh Bradley, Rebecca Grassl Bradley, and Rebecca Frank Dallet.

Id., ¶99. An early case of the Wisconsin Supreme Court expounded the powers of the executive branch: "whatever power or duty is expressly given to, or imposed upon the executive department, is altogether free from the interference of the other branches of the government. Especially is this the case, where the subject is committed to the discretion of the chief executive officer, either by the constitution or by the laws. So long as the power is vested in him, it is to be by him exercised, and no other branch of the government can control its exercise." Att'y Gen. ex rel. Taylor v. Brown, 1 Wis. 422 [513*], 449 [522*] (1853).

¶16 In executing the law, the executive branch must make decisions about how to enforce and effectuate the laws. The text of the statutes enacted by the legislature limits the exercise of executive discretion. Fabick v. Evers, 2021 WI 28, ¶14, 396 Wis. 2d 231, 956 N.W.2d 856 ("[I]f the governor has authority to exercise certain expanded powers not provided in our constitution, it must be because the legislature has enacted a law that passes constitutional muster and gives the governor that authority."). Put simply, "the legislature's authority comprises the power to make the law, whereas the executive's authority consists of executing the law. The distinction between the two has been described as the difference between the power to prescribe and the power to put something into effect[.]" SEIU, 393 Wis. 2d 38, ¶95. Neither the legislature nor the executive "ought to possess directly or indirectly, an overruling influence over the other[] in the administration of their respective powers." The Federalist No. 48, supra, at 332 (James Madison).

12

¶17 Wisconsin Stat. §§ 23.0917(6m) and 23.0917(8)(g)3. establish a legislative review process requiring the DNR to notify the JFC if it intends to obligate state funds for certain land acquisition projects. The statutes allow the JFC to indefinitely delay an expenditure if one of its members requests a meeting on the proposed expenditure. The petitioners contend this procedure unlawfully intrudes upon the governor's core powers to "take care that the laws be faithfully executed." Wis. Const. art. V, § 4. The legislative respondents urge this court to instead classify the statutory scheme as falling within the shared powers of the executive and legislative branches because the DNR is an administrative agency created by the legislature and subject to legislative oversight. The respondents additionally argue that spending appropriated funds is a shared power because Article VIII, § 2 of the Wisconsin Constitution gives the legislature the power to appropriate funds.

¶18 The constitutional text belies this argument. "No money shall be paid out of the treasury except in pursuance of an appropriation by law." Wis. Const. art. VIII, § 2 (Emphasis added.). While the constitution gives the legislature the power to appropriate funds, the power to spend the funds the legislature has appropriated for a specific project belongs to the executive branch. This is true even though the legislature created the DNR. While the legislature has the power create an agency, define its powers, and appropriate funds to fulfill the purpose for which the legislature established it, the power to spend appropriated funds in accordance with the law enacted by the legislature lies solely

13

within the core power of the executive to ensure the laws are faithfully executed.

¶19  We conclude these statutes interfere with the executive branch's core function to carry out the law by permitting a legislative committee, rather than an executive branch agency, to make spending decisions for which the legislature has already appropriated funds and defined the parameters by which those funds may be spent.  A statute authorizing the legislative branch to exercise core powers of the executive branch violates the constitutional separation of powers and cannot be enforced under any circumstances.  The legislative review provisions governing expenditures under the Program in Wis. Stat. §§ 23.0917(6m) and 23.0917(8)(g)3. are unconstitutional.

¶20 Although the legislature retains the authority to conduct oversight investigations[11] and audits of administrative agencies,[12] empowering a legislative committee to block the expenditure of appropriated funds exceeds the legislative power and intrudes upon the executive branch's authority to execute the law.  Once the legislature appropriates funds for a particular purpose, the executive branch possesses the power to dole out those

---

[11] State v. Frear, 138 Wis. 173, 119 N.W.2d 894, 895 (1909) (holding "[t]he Legislature has very broad discretionary power to investigate any subject respecting which it may desire information in aid of the proper discharge of its function to make or unmake written laws").

[12] See Wis. Const. art. IV, § 33 (giving the legislature the authority to audit "state accounts"); Wis. Stat. § 13.53 (establishing a joint legislative audit committee).

14

funds in accordance with the purposes outlined by the legislature. See Frank H. Easterbrook, "Success" and the Judicial Power, 65 Ind. L.J. 277, 281 (1990) ("[H]anding out public money is a classically executive function."). While the legislature's motivation for overseeing the public fisc may be well-intentioned, fundamentally, the legislature may not execute the law; the people gave the executive alone this power. Maintaining a strict separation between the branches is essential to the preservation of liberty because "a government with shared legislative and executive power could first 'enact tyrannical laws' then 'execute them in a tyrannical manner.'" Gabler, 376 Wis. 2d 147, ¶5 (quoting 1 Montesquieu, The Spirit of the Laws 151-52 (Oskar Piest et al. eds., Thomas Nugent trans., 1949) (1748)). To prevent this dangerous concentration of power, the constitution prohibits "'the same persons who have the power of making laws to have also in their hands the power to execute them.'" Id. (quoting John Locke, The Second Treatise of Civil Government § 143 (1764), reprinted in Two Treatises of Government 119, 194 (Thomas I. Cook ed., 1947)).

¶21 When the executive branch acts under a grant of authority from the legislature, its authority "is at its maximum." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). The decision of the DNR to distribute funds for a specific project or land acquisition is an exercise of executive power because the legislature conferred that authority on the executive when it established and reauthorized the program. The legislature retains the authority to "withdraw powers which have been granted, prescribe the procedure through which granted

15

powers are to be exercised, and, if necessary, wipe out the agency entirely." Whitman, 196 Wis. at 508. The legislature could take away or limit the discretion of the executive branch to make spending decisions for the Program, but once it has conferred spending power on the executive, the legislative branch lacks any constitutional authority to reject an executive decision short of exercising its lawmaking power with the full participation of the legislature.

¶22 In this case, the legislature has prescribed by law the parameters of how and where the DNR may expend state funds under the Program. For example, Wis. Stat. § 23.0917(3)(c) identifies a variety of purposes the DNR should prioritize in obligating funds for land acquisition. The statutes authorizing the Program also identify both prohibitions and limitations on the types of projects eligible for funding. For example, the DNR may not obligate funds "for the acquisition of land for golf courses or for the development of golf courses." § 23.0917(8)(a). The statutes also limit how much money the DNR can obligate for land acquisition each fiscal year. § 23.0917(3)(dm). This sort of statutory line drawing lies squarely within the legislature's core powers to enact laws and make spending decisions for the state. Flynn, 216 Wis. 2d at 547 ("Several sections of the Wisconsin Constitution together provide that the legislature has the power to enact laws which appropriate funds."); State ex rel. Friedrich v. Cir. Ct. for Dane Cnty., 192 Wis. 2d 1, 16, 531 N.W.2d 32 (1995) (per curiam) ("The legislature has power to enact legislation for the general welfare and to allocate government resources."). However,

16

§§ 23.0917(6m) and 23.0917(8)(g)3. give JFC members the power to decide how the funds should be used after the lawmaking process has been completed and the funds have been appropriated to the DNR——a quintessential executive function.

¶23 Once the legislature passes a bill that is signed by the governor and becomes law, "the legislature plays no part in enforcing our statutes[.]" Soc'y Ins. v. LIRC, 2010 WI 68, ¶27, 326 Wis. 2d 444, 786 N.W.2d 385. The constitution assigns the execution of the law to the executive branch alone. Wis. Const. art. V, § 4. After the legislative process has been completed and funds have been appropriated, the legislature cannot insert itself into the machinery of the executive branch in an attempt to control the executive branch's ability to carry out the law. While the legislature retains the power to repeal, modify, or alter a law through the enactment of a bill, it cannot seize for itself the authority to prevent an expenditure of state funds appropriated under Article VIII, Section 2. See Bowsher v. Synar, 478 U.S. 714, 734 (1986) (Congress cannot retain "control over the execution" of a statute).

¶24 Wisconsin Stat. §§ 23.0197(6m) and 23.0197(8)(g)3. effectively create a legislative veto, allowing the JFC to interfere with and even override the executive branch's core power of executing the law. If the JFC does not object to a proposed project within the 14 day review window, the DNR may spend the money. But if a single JFC member objects to the DNR's project proposal, the JFC will hold a meeting and can either approve the proposed funding in full, modify the amount to be disbursed, or

17

outright reject the project.  The statutes omit a deadline for the JFC to hold a meeting if there is an objection to a proposed expenditure.  The review process ultimately permits the members of the JFC to serve as gatekeeper to the exercise of a core executive function.  Effectively, JFC members make the spending decision——not the executive branch.  This unfettered interference by the committee oversteps the boundaries of legislative authority by arrogating the executive branch's core power to choose which conservation projects best carry out the statutory purposes of the Program.

¶25  In defending the JFC's statutory review process, the legislature did not offer any historical support surrounding the state's founding for similar post-enactment legislative review processes as a prerequisite for executive branch action.  Instead, the legislature cites the emergence of complex state governance in the 1970s and 1980s as the impetus for legislative committee review provisions.  Rather than grounding their arguments in our constitution's text or our state's history, as reflected in our recent separation of powers jurisprudence, the legislative respondents primarily rely on the court of appeals decision J.F. Ahern Co. v. Wisconsin State Building Commission, 114 Wis. 2d 69, 336 N.W.2d 679 (Ct. App. 1983), to justify the legislative review process created by Wis. Stat. §§ 23.0917(6m) and 23.0917(8)(g)3.  The respondents argue the opinion is "detailed and well-reasoned" and "entitled to full stare decisis respect" from this court.  We disagree and overrule Ahern to the extent its reasoning conflicts with our analysis in this case.  We are "not bound by court of

18

appeals decisions" and they may be overruled without any special justification.  State v. Yakich, 2022 WI 8, ¶31, 400 Wis. 2d 549, 970 N.W.2d 12; accord Cook v. Cook, 208 Wis. 2d 166, 190, 560 N.W.2d 246 (1997) (This court "has the power to overrule, modify or withdraw language from a published opinion of the court of appeals"); State v. Lira, 2021 WI 81, ¶45, 399 Wis. 2d 419, 966 N.W.2d 605 ("This court has never applied the five factors commonly used in a decision to overturn supreme court caselaw to override an interpretation derived solely from the court of appeals."); State v. Johnson, 2023 WI 39, ¶20, 407 Wis. 2d 195, 990 N.W.2d 174 ("[W]e have never required a special justification to overturn a decision of the court of appeals.").

¶26  In Ahern, the appellants alleged the State Building Commission——a legislative committee consisting of three assemblymen, three senators, the governor, and a citizen appointee of the governor——was authorized to exercise executive power in violation of the separation of powers.  114 Wis. 2d at 99-100.  At issue was the Building Commission's statutory authority to waive a competitive bidding law on state construction contracts and its right of prior approval over a contract for the construction of any building that involved a cost exceeding $15,000.  Id. at 104-05.  Although the court of appeals recognized this scheme allowed members of the legislature "to exercise executive powers to the

19

exclusion of the executive branch[,]" it nevertheless upheld it.[13] Id. at 107. According to the court, the separation of powers is not strictly enforced and instead "liberally applied." Id. at 102. It employed a "pragmatic approach" to the doctrine, finding no violation because the respective powers of the executive and legislative branches ostensibly were balanced: "[T]he Wisconsin Constitution, subject to the limitation against 'unchecked power,' permits a blending or sharing of powers among the three branches of government." Id. at 103-04. Because the governor could always choose not to approve a contract, the court of appeals deemed the executive and legislative powers adequately balanced. Id. at 107 ("[I]f the executive branch can check the commission's exercise of executive power, no violation of the separation doctrine exists."). The court of appeals viewed this "compulsory unanimity" between the legislature and executive as a "cooperative venture between the two governmental branches." Id. at 108.

¶27 The pragmatic approach applied in Ahern cannot be squared with the separation of powers principles embedded in our state constitution or the rationale underlying them: the dispersal of distinct powers among the three branches of government and the threats to liberty arising from the concentration of powers in one branch. See Gabler, 376 Wis. 2d 147, ¶7; SEIU, 393 Wis. 2d 38, ¶30; League of Women Voters, 387 Wis. 2d 511, ¶31. Absent the

---

[13] J.F. Ahern Co. v. Wis. State Bldg. Comm'n, 114 Wis. 2d 69, 105, 336 N.W.2d 679 (Ct. App. 1983) ("Because that right of prior approval affects the implementation of established law and policy, it is an executive power.").

20

consent of the governed, none of the branches bear any authority to reallocate the powers the people constitutionally assigned to them. We overrule Ahern to the extent it endorses a restructuring of the constitutional separation of powers. Its functionalist analysis——which condones the "cooperative" sharing of core powers——subverted the constitution's separation of governmental powers.

¶28 The legislative respondents defend the legislative review process based on the "practicalities of modern legislation and administrative agencies . . . [which] frequently involve[] regulatory agencies administering broad legislative programs." According to the respondents, review is particularly imperative in this case because "the DNR has mismanaged the Knowles-Nelson Stewardship Program," including failing to control spending. We reject the respondents' pragmatic arguments for sustaining the statutes because the legislature has no authority to control executive branch efforts to carry out the law. The constitution does not empower any branch to circumvent the constitutional confines of its authority even if it "believe[s] that more or different power is necessary." A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 529 (1935). "[I]n the long run the improvisation of a constitutional structure on the basis of currently perceived utility will be disastrous." Mistretta v. United States, 488 U.S. 361, 427 (1989) (Scalia, J., dissenting). Upholding the statutes based on pragmatic considerations would reallocate the constitutionally prescribed core powers of the executive branch and the legislative branch in our state constitution. The power to do so belongs to the people alone.

21

"Resolute resistance to intrusions across the constitutionally constructed . . . perimeter[s] does not represent a power play by one branch vis-à-vis another. 'The purpose of the separation and equilibration of powers in general . . . was not merely to assure effective government but to preserve individual freedom.'" Gabler, 376 Wis. 2d 147, ¶39 (quoting Morrison v. Olson, 487 U.S. 654, 727 (Scalia, J., dissenting)).

¶29 Legislative vetoes disrupt the governmental accountability the separation of powers facilitates. By appropriating a sum of money to the DNR for the Program with only broad direction, the legislature avoids the political judgments and votes necessary to appropriate funds with greater specificity. "[T]he legitimation of the legislative veto will enable continuation and expansion of the recent practice of adopting major measures by a process which preserves congressional control while relieving the people's representatives of the embarrassment of voting." Antonin Scalia, The Legislative Veto: A False Remedy for System Overload, 3 Regulation: AEI Journal on Government and Society, 19, 25 (Nov./Dec. 1979). "If [the legislature] is willing to commit a matter to the executive, well and good; but if [the legislature] wants to retain control of the matter, and thereby admits that it has not completed its legislative function——then it must act by voting[.]" Id. The veto provisions undermine democratic governance by circumventing the lawmaking process—— which requires the participation of the entire legislature——and punting to a committee the controversial and therefore politically costly positions legislators would otherwise need to take.

22

¶30 The legislature's concerns about the executive branch's unwillingness to faithfully execute the program in accordance with legislative policy preferences may be addressed via numerous constitutional tools at the legislature's disposal to rein in the executive branch. The legislature could lawfully limit the Program using its appropriation power to decrease funding for the Program, by narrowing the scope of discretion afforded to the executive branch through legislation, by enacting sunset provisions[14] requiring the Program to be reauthorized by a later legislative session, by auditing the executive agency administering the Program, or by eliminating the Program altogether. Whitman, 196 Wis. at 508 ("[A]dministrative agencies are the creatures of the legislature and are responsible to it. Consequently the legislature may withdraw powers which have been granted, prescribe the procedure through which granted powers are to be exercised, and if necessary, wipe out the agency entirely."). Additionally, the legislature could enact line-item appropriations for specific projects.[15]

¶31 Our holding does not expand executive power but rather preserves the constitutional roles the people assigned to the

---

[14] The legislature in fact included a sunset provision for the Program, authorizing current funding levels only through the 2025-26 fiscal year. Wis. Stat. § 23.0917(3)(dm)(8).

[15] When the legislature created the land acquisition and conservation program, the statutes identified specific projects and areas to be funded through the appropriation (e.g., "Hank Aaron State Trail") but also identified general areas on which the funds could be spent (e.g., "Wildlife habitat restoration and fisheries"). See generally Wis. Stat. § 23.0915 (1991-92).

executive and legislative branches. We reiterate the constitutional boundaries of governmental powers to ensure the branches do not "abdicate or permit others to infringe upon such powers as are exclusively committed to them by the constitution." Rules of Court Case, 204 Wis. 501, 514, 236 N.W. 717 (1931). As part of our judicial duty, this court "must be assiduous in patrolling the borders between the branches" because the separation of powers doctrine "provides structural protection against depredations on our liberties." Tetra Tech, 382 Wis. 2d 496, ¶45. Our decision neither enhances executive power nor curtails legislative power. We simply confine the legislature to lawmaking and leave the execution of the laws to the executive as the Wisconsin Constitution commands. Gabler, 376 Wis. 2d 147, ¶60 ("The significance of preserving clear boundaries between the branches has been understood since the founding of our nation"). In doing so, we expound the law, which in this case involves applying principles embodied in the state constitution since ratification. "In the same fashion as the United States Constitution, the Wisconsin Constitution preserves the independence of each branch vis-à-vis the others and precludes each branch from obstructing the performance of another branch's constitutional duties." League of Women Voters, 387 Wis. 2d 511, ¶32 (citing United States v. Klein, 80 U.S. (13 Wall.) 128, 147 (1872)).

¶32 James Madison warned of the ambition of the legislative branch to grasp at powers beyond its constitutional realm: "The legislative department is everywhere extending the sphere of its

24

activity, and drawing all power into its impetuous vortex." The Federalist No. 48, supra, at 333. The legislative "powers being at once more extensive, and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments." Id. at 334. In granting the JFC the ability to stymie the executive branch from carrying out the laws passed by the legislature, the statutes encroach upon the governor's constitutional mandate to execute the law.

¶33 While the legislature possesses the power to determine whether and how to fund the land acquisition portion of the Program,[16] the constitution does not empower the legislature to participate in the execution of the law, nor can the legislature give itself such authority. The legislative review provisions in Wis. Stat. §§ 23.0917(6m) and 23.0917(8)(g)3. violate the Wisconsin Constitution by assigning the core executive power to carry out the law to a legislative committee. The constitution's vesting of core powers in each of the three branches of government may not be statutorily altered. In declaring these separation of powers principles, we ensure the branches do not arrogate powers the people never gave them.

IV. CONCLUSION

¶34 Article IV, Section 1 of the Wisconsin Constitution

---

[16] Flynn v. DOA, 216 Wis. 2d 521, 253-54, 576 N.W.2d 245 (1998) ("The legislature, as the government body closest to the will of the people, may change an appropriation if, in their estimation, public policy so dictates. It is the legislature's role to determine whether to reallocate limited resources.").

vests broad authority in the legislature to pass laws reflecting the legislature's policy choices. In enacting the Program, the legislature elected to leave some decisions to executive branch discretion, subject to a legislative veto embodied in a committee the legislature empowered to reject the executive's manner of carrying out the law. Wisconsin Stat. §§ 23.0917(6m) and 23.0917(8)(g)3. invade the executive branch's authority to "take care that the laws be faithfully executed," Wis. Const. Art. V, § 4, by interfering with the exercise of discretion the legislature gave it to execute the Program. Maintaining the separation of powers between the branches is essential for the preservation of liberty and a government accountable to the people. By placing the power of the executive branch to carry out the law in a committee of the legislature, the legislative branch subsumed the executive power. Because §§ 23.0917(6m) and 23.0917(8)(g)3. give core executive power to the legislative branch, they are unconstitutional.

*By the court*——Wis. Stat. §§ 23.0917(6m) and 23.0917(8)(g)3. are declared unconstitutional.

¶35 ANN WALSH BRADLEY, J. *(concurring)*. Sometimes it is just as important to emphasize what a majority opinion is not about as it is to clarify what the opinion is about. This is such an occasion.

¶36 The focus of the majority opinion is on core executive powers. It need not, and does not, define the contours of any core legislative powers or shared powers. Additionally, despite the exchange in the separate writings below, this case is not about the non-delegation doctrine. It was not briefed or argued by the parties and the majority opinion does not address it.

¶37 Having delineated the substance of the majority opinion, I turn next to discuss why I concur. I join the majority opinion but write separately to briefly address the standard of review in constitutional cases.

¶38 As in any case, our review in the present case is guided and circumscribed by our standard of review. In constitutional cases, we have long adhered to a standard that places a "heavy burden" on a challenging party. See, e.g., Mayo v. Wis. Injured Patients & Fams. Comp. Fund, 2018 WI 78, ¶27, 383 Wis. 2d 1, 914 N.W.2d 678.

¶39 Namely, we have presumed that a statute is constitutional and placed the onus on the challenger to demonstrate that the statute is unconstitutional "beyond a reasonable doubt." State v. Prado, 2021 WI 64, ¶37, 397 Wis. 2d 719, 960 N.W.2d 869; see also Cath. Charities Bureau, Inc. v. LIRC, 2024 WI 13, ¶¶5, 77, 94, 411 Wis. 2d 1, 3 N.W.3d 666; State v. Christen, 2021 WI

1

39, ¶32, 396 Wis. 2d 705, 958 N.W.2d 746; State v. Roundtree, 2021 WI 1, ¶18, 395 Wis. 2d 94, 952 N.W.2d 765; Winnebago County v. C.S., 2020 WI 33, ¶14, 391 Wis. 2d 35, 940 N.W.2d 875. The phrase "beyond a reasonable doubt" "expresses the 'force or conviction with which a court must conclude, as a matter of law, that a statute is unconstitutional before the statute . . . can be set aside.'" Mayo, 383 Wis. 2d 1, ¶27 (quoted source omitted).

¶40 In the briefing in this case, the Governor advocated for a narrow alteration to our constitutional standard of review. This argument was circumscribed, advancing that the standard of review for constitutional cases should change in the context of a separation-of-powers dispute only. Namely, the Governor argued: "When the legislative branch passes a law that allegedly usurps another branch's core power, presuming such a statute to be valid would improperly place a thumb on the legislative branch's side of the scale."

¶41 The argument is persuasive, and I agree with it. The reasoning behind this is succinctly stated in Justice Scalia's dissent in Morrison v. Olson, where it is explained that if the branches of government are to be truly equal, none may begin inter-branch litigation with the advantage that a presumption of constitutionality affords:

> Where a private citizen challenges action of the Government on grounds unrelated to separation of powers, harmonious functioning of the system demands that we ordinarily give some deference, or a presumption of validity, to the actions of the political branches in what is agreed, between themselves at least, to be within their respective spheres. But where the issue pertains to separation of powers, and the political branches are

2

(as here) in disagreement, neither can be presumed correct.

487 U.S. 654, 704-05 (1988) (Scalia, J., dissenting). If the branches of government are "perfectly co-ordinate," then the playing field must be a level one. See id. at 705. Where the very issue before the court is the contours of the branches' powers vis-à-vis each other, it is not logical to begin the case with a slant in either direction.

¶42 I emphasize that our "beyond a reasonable doubt" standard of review retains vitality, but as presented in the argument before us, I conclude that the "beyond a reasonable doubt" standard is a poor fit in the separation-of-powers context. Abandoning the standard in the context of separation of powers evens the playing field between the branches, while leaving the standard of review for other types of constitutional challenges intact.

¶43 For the foregoing reasons, I respectfully concur.

¶44 I am authorized to state that Justices REBECCA FRANK DALLET and JANET C. PROTASIEWICZ join this concurrence.

¶45 REBECCA GRASSL BRADLEY, J. *(concurring).* "[T]hat the legislative, executive and judiciary departments ought to be separate and distinct" is an "essential precaution in favor of liberty." The Federalist No. 47, at 323 (James Madison) (Jacob E. Cooke ed., 1961). Like the Framers of the Federal Constitution, the Founders of our state believed the separation of powers was "essential to the preservation of liberty." The Federalist No. 51, supra, at 348 (James Madison). The "tripartite separation of independent governmental power" enshrined in our constitutions "remains the bedrock of the structure by which we secure liberty in both Wisconsin and the United States." Gabler v. Crime Victims Rts. Bd., 2017 WI 67, ¶3, 376 Wis. 2d 147, 897 N.W.2d 384.

¶46 The structural separation of powers protects the liberty of the People by barring the aggregation of power within one branch of government. League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶31, 387 Wis. 2d 511, 929 N.W.2d 209; Koschkee v. Taylor, 2019 WI 76, ¶45, 387 Wis. 2d 552, 929 N.W.2d 600 (Rebecca Grassl Bradley, J., concurring); Gundy v. United States, 588 U.S. 128, 156-57 (2019) (Gorsuch, J., dissenting). "[A] mere demarcation on parchment of the constitutional limits of the several departments," however, "is not a sufficient guard against those encroachments which lead to a tyrannical concentration of all the powers of government in the same hands." The Federalist No. 48, supra, at 338 (James Madison). Keeping each branch "within the limits assigned to their authority" rests largely with the judiciary because constitutional limitations on the exercise of governmental power "can be preserved in practice no other way than

1

through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing." The Federalist No. 78, supra, at 524-25 (Alexander Hamilton).

¶47 In 2017, this court protected the judicial branch's core powers from legislative interference. Gabler, 376 Wis. 2d 147. In 2019, this court safeguarded the legislature's core powers against judicial encroachment. League of Women Voters, 387 Wis. 2d 511. Today, this court restores the executive branch's core powers after legislative arrogation. Consistent application of the separation of powers principles espoused in these cases requires the court to retrieve the legislature's core lawmaking power from the administrative apparatus residing in the executive branch.

¶48 As the court expounded in Gabler and reiterates in this case, preservation of the separation of powers does not prefer one branch over another. We defend the constitutional boundaries of governmental authority to preserve individual freedom, to ensure the people remain sovereign over those to whom the people delegated the power to govern. "[D]eriving [its] just powers from the consent of the governed," Wisconsin's government was instituted to secure the people's inherent rights, including "life, liberty and the pursuit of happiness[.]" Wis. Const. art. I, § 1.

¶49 Our constitution vests three separate branches——the legislature, the executive, and the judiciary——with particular powers, which no other branch may wield. See majority op., ¶9.

2

"When the [g]overnment is called upon to perform a function that requires an exercise of legislative, executive, or judicial power, only the vested recipient of that power can perform it."[1] Dep't of Transp. v. Ass'n of Am. R.R., 575 U.S. 43, 68 (2015) (Thomas, J., concurring in the judgment). Any deviation from the division of powers the people delegated to each branch would be illegitimate, having been made without the people's consent.

¶50 In this case, the court vindicates the constitution's design by holding the legislature cannot take for itself the executive's core function of executing the law, even if the executive at one time consented to the arrangement. The court's decision in this case does not enhance executive power; rather, it returns the legislature to its constitutionally prescribed domain. See Fabick v. Evers, 2021 WI 28, ¶57, 396 Wis. 2d 231, 956 N.W.2d 856 (Rebecca Grassl Bradley, J., concurring) ("This court does not referee partisan battles; our duty is to ensure that each branch of government respects the constitutional limits of its authority."). The separation of powers, and its protection of the people's liberty, would collapse if one branch could seize for itself the powers of another. See Gabler, 376 Wis. 2d 147, ¶31.

¶51 The constitution guards against one branch's attempts to cede its powers to another branch as much as it prevents one branch from usurping another branch's powers. Tetra Tech EC, Inc. v.

---

[1] While "[t]he allocation of powers in the Constitution is absolute," Dep't of Transp. v. Ass'n of Am. R.R., 575 U.S. 43, 69 (2015) (Thomas, J., concurring in the judgment) (citation omitted), the powers of each branch at times overlap. See Gabler v. Crime Victims Rts. Bd., 2017 WI 67, ¶34, 376 Wis. 2d 147, 897 N.W.2d 384.

3

DOR, 2018 WI 75, ¶48, 382 Wis. 2d 496, 914 N.W.2d 21 (lead opinion) (a branch may not "abdicat[e]" or "abandon" its power and the other branches cannot "take [] up" the powers of another). "Acknowledging the dangers of accumulated power," our constitution "preclude[s] each branch of government from delegating its own vested powers." Fabick, 396 Wis. 2d 231, ¶54 (Rebecca Grassl Bradley, J., concurring). The legislative power, "the power to adopt generally applicable rules of conduct governing future actions by private persons——the power to 'prescrib[e] the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society,'" Gundy, 588 U.S. at 153 (Gorsuch, J., dissenting) (citations omitted) (alteration in original), belongs to the legislature alone. Wis. Const. art. IV, § 1 ("The legislative power shall be vested in a senate and assembly."); see also id. art. IV, § 22 (creating one exception); Becker v. Dane Cnty., 2022 WI 63, ¶¶76, 113-16, 403 Wis. 2d 424, 977 N.W.2d 390 (Rebecca Grassl Bradley, J., dissenting).

¶52 The vesting clauses conclusively confer the powers each branch may exercise: "No one"——not the legislature, the executive, or the judiciary——may "alter [the] arrangement" enshrined in our constitution. Gundy, 588 U.S. at 153 (Gorsuch, J., dissenting); League of Women Voters, 387 Wis. 2d 511, ¶35 (quoting Goodland v. Zimmerman, 243 Wis. 459, 467, 10 N.W.2d 180 (1943)) ("The separation of powers 'operates in a general way to confine legislative powers to the legislature.'"); Wis. Legislature v. Palm, 2020 WI 42, ¶67, 391 Wis. 2d 497, 942 N.W.2d 900 (Rebecca

4

Grassl Bradley, J., concurring) (footnote omitted) ("Statutory law being subordinate to the constitution, not even the people's representatives in the legislature may consolidate [] power in one person."). The "'power to make law . . . was reserved exclusively to the Legislature, and any attempt to abdicate it in any particular field, though valid in form, must, necessarily, be held void.'" Rules of Court Case, 204 Wis. 501, 503, 236 N.W. 717 (1931) (quoting State ex rel. Mueller v. Thompson, 149 Wis. 488, 491, 137 N.W. 20 (1912)). "Because the people gave the legislature its power to make laws, the legislature alone must exercise it. Our constitutional structure confers no authority on any branch to subdelegate any powers the sovereign people themselves delegated to particular governmental actors." Fabick, 396 Wis. 2d 231, ¶56 (Rebecca Grassl Bradley, J., concurring).

¶53 This court's enforcement of the non-delegation doctrine embedded in our constitution eroded over time. The court has allowed executive branch officials and unelected bureaucrats to exercise the lawmaking power of the legislature, see, e.g., Koschkee, 387 Wis. 2d 552, ¶12 (stating "when administrative agencies promulgate rules, they are exercising legislative power that the legislature has chosen to delegate to them by statute"), provided adequate "procedural safeguards" are in place. Panzer v. Doyle, 2004 WI 52, ¶¶54-55, 70-71, 271 Wis. 2d 295, 680 N.W.2d 666, abrogated on other grounds by Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408; Gilbert v. State, Med. Examining Bd., 119 Wis. 2d 168, 186, 349 N.W.2d 68 (1984); Westring v. James, 71 Wis. 2d 462, 468, 238 N.W.2d 695

(1976); Watchmaking Examining Bd. v. Husar, 49 Wis. 2d 526, 536, 182 N.W.2d 257 (1971); Schmidt v. Dep't of Res. Dev., 39 Wis. 2d 46, 57-58, 158 N.W.2d 306 (1968). The procedural safeguard requirement is not demanding. Panzer, 271 Wis. 2d 295, ¶¶70-71. The court replaced the constitution's bar on subdelegating legislative power with illusory "limits drawn by the judiciary." Fabick, 396 Wis. 2d 231, ¶61 (Rebecca Grassl Bradley, J., concurring); Becker, 403 Wis. 2d 424, ¶111 (Rebecca Grassl Bradley, J., dissenting).

¶54 The court's reluctance to enforce the constitutional constraints on subdelegation emerged long after Wisconsin's founding. "In the early years of Wisconsin's statehood, this court understood that the three branches of government could not delegate their vested powers, imposing substantive limitations on the legislature's assignment of authority to the executive to carry out the legislature's policies." Fabick, 396 Wis. 2d 231, ¶64 (Rebecca Grassl Bradley, J., concurring). As the court in Slinger v. Henneman explained, "It is a settled maxim of constitutional law, that the power thus conferred upon the legislature cannot be delegated by that department to any other body or authority." 38 Wis. 504, 509-10 (1875). "Legislators have no power to anoint legislators; only the people do." Becker, 403 Wis. 2d 424, ¶75 (Rebecca Grassl Bradley, J., dissenting). Accordingly, the constitution requires that "a law must be complete, in all its terms and provisions, when it leaves the legislative branch of the government, and nothing must be left to the judgment of the electors or other appointee or delegate of the legislature."

Dowling v. Lancashire Ins. Co., 92 Wis. 63, 74, 65 N.W. 738 (1896); accord State ex rel. Adams v. Burdge, 95 Wis. 390, 401-02, 70 N.W. 347 (1897). Laws violating this rule were held "inoperative and void." Slinger, 38 Wis. at 510. It was only "in the wake of the Progressive era[] [that] this court began to uproot substantive limits on the legislature's delegation of its constitutionally-conferred powers." Fabick, 396 Wis. 2d 231, ¶64 (Rebecca Grassl Bradley, J., concurring).

¶55 Apologists for delegations of legislative authority to the executive branch primarily invoke the ostensible "overpowering necessity" of modern governance. State ex rel. Wis. Inspection Bureau v. Whitman, 196 Wis. 472, 498, 220 N.W. 929 (1928); Koschkee, 387 Wis. 2d 552, ¶17 (quoting Gilbert, 119 Wis. 2d at 184) ("We have long recognized that 'the delegation of the power to make rules and effectively administer a given policy is a necessary ingredient of an efficiently functioning government.'"); Mistretta v. United States, 488 U.S. 361, 372 (1989) (citations omitted) ("[O]ur jurisprudence has been driven by a practical understanding that in our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives."). But "[t]hose to whom the people have conferred constitutional powers may not circumvent those grants simply 'because they believe that more or different power is necessary.'" Koschkee, 387 Wis. 2d 552, ¶46 (Rebecca Grassl Bradley, J., concurring) (quoting A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 529 (1935)). Even "[e]xtraordinary

7

conditions"——such as a global pandemic——"do not create or enlarge constitutional power." A.L.A. Schechter, 295 U.S. at 528; Fabick, 396 Wis. 2d 231, ¶50 (Rebecca Grassl Bradley, J., concurring); Palm, 391 Wis. 2d 497, ¶¶70, 73 (Rebecca Grassl Bradley, J., concurring). If emergencies do not enlarge the legislature's ability to delegate legislative power, then the permanent, ongoing "necessity" known as "modernity" does not either. See Philip Hamburger, Is Administrative Law Unlawful?, at 422 (2014).

¶56 In this case, the court vindicates that principle, rejecting the legislative respondents' pragmatic arguments rooted in the supposed necessity of revamping the Founders' design in favor of modern, but constitutionally suspect, governance. Majority op., ¶28. "Whenever any branch of government exceeds the boundaries of authority conferred by the people, it is the duty of the judicial branch to say so." Palm, 391 Wis. 2d 497, ¶66 (Rebecca Grassl Bradley, J., concurring). The first principles espoused in this court's decision should revitalize the dormant non-delegation doctrine, reject the discredited notion that the "necessities" of modern governance justify disregarding our constitution's commands, and restore our original understanding of the vesting clauses, which bar any subdelegation of the legislature's powers.

¶57 Today, the court upholds the structural separation of powers enshrined in the constitution. Not all members of the majority have done so in the past. See, e.g., Becker, 403 Wis. 2d 424, ¶30 (lead opinion) (minimizing the separation of powers as something the court has "inferred" but "never

8

interpreted . . . in a literal sense"); League of Women Voters, 387 Wis. 2d 511, ¶¶43-54 (Dallet, J., dissenting) (joined by Ann Walsh Bradley, J.) (dissenting from decision declaring the December 2018 extraordinary session of the Wisconsin Legislature constitutional). As Chief Justice Annette Kingsland Ziegler notes in her dissent, "we have no assurance that constitutional principles . . . will be equally applied, in the same manner, across the board, to the other branches in the future." Dissent, ¶83. The Chief Justice's concern is well founded. With respect to the exercise of governmental powers, three members of the majority (Justices Ann Walsh Bradley, Rebecca Frank Dallet, and Jill J. Karofsky) have invariably ruled against the legislature and in favor of the executive branch.[2] They have been the only

---

[2] See, e.g., Clarke v. Wis. Elections Comm'n, 2023 WI 79, 410 Wis. 2d 1, 998 N.W.2d 370 (adopting Governor Evers' position and invalidating the legislature's redistricting maps); Wis. Mfrs. & Com. v. Evers, 2022 WI 38, ___ Wis. 2d ___, 977 N.W.2d 374 (allowing Governor Evers' Department of Health Services to release the names of Wisconsin employers whose employees tested positive for COVID-19); Johnson v. Wis. Elections Comm'n, 2022 WI 14, 400 Wis. 2d 626, 971 N.W.2d 402, rev'd sub nom. Wis. Legislature v. Wis. Elections Comm'n, 595 U.S. 398 (per curiam)) (adopting Governor Evers' proposed congressional map and state legislative maps and rejecting the legislature's); Clean Wis., Inc. v. DNR, 2021 WI 72, 398 Wis. 2d 433, 961 N.W.2d 611 (ruling against the legislature and expanding executive branch power by allowing administrative agencies to impose requirements not explicitly permitted by statute); Clean Wis., Inc. v. DNR, 2021 WI 71, 398 Wis. 2d 386, 961 N.W.2d 346 (ruling against the legislature and in favor of Governor Evers' Department of Natural Resources in allowing the DNR to impose requirements not explicitly permitted by statute); Fabick v. Evers, 2021 WI 28, ¶¶74-148, 396 Wis. 2d 231, 956 N.W.2d 856 (Ann Walsh Bradley, J., dissenting) (joined by Dallet and Karofsky, JJ.) (dissenting from decision that Governor Evers' executive orders proclaiming successive states of emergency based on COVID-19 exceeded the Governor's powers); Democratic Nat'l Comm. v. Bostelmann, 2020 WI 80, ¶¶15-27, 394 Wis. 2d 33, 949 N.W.2d 423 (Dallet, J., dissenting)

justices during the past five years to demonstrate uniform allegiance to one branch and unvarying hostility toward another.

¶58  "Working from an understanding of the [c]onstitution at war with its text and history," Justice Rebecca Frank Dallet's denialism toward the non-delegation doctrine——a foundational principle "respecting the people's sovereign choice to vest the legislative power in [the legislature] alone"——betrays a willingness to destabilize "a structure designed to protect [the people's] liberties, minority rights, fair notice, and the rule of

---

(joined by Ann Walsh Bradley and Karofsky, JJ.) (dissenting from decision recognizing legislature's right to participate as a party in litigation defending the validity of state laws); Bartlett v. Evers, 2020 WI 68, ¶¶109-71, 393 Wis. 2d 172, 945 N.W.2d 685 (Ann Walsh Bradley, J., concurring in part, dissenting in part) (joined by Dallet, J.) (in original action requesting a declaration that Governor Evers exceeded his constitutional authority to partially veto appropriation bills, Justices Ann Walsh Bradley and Dallet were the only justices who would have declared all of Governor Evers' vetoes constitutional); Serv. Emps. Int'l Union, Loc. 1 v. Vos, 2020 WI 67, ¶¶163-88, 393 Wis. 2d 38, 946 N.W.2d 35 (Dallet, J., concurring in part, dissenting in part) (joined by Ann Walsh Bradley, J.) (dissenting from decision upholding the constitutionality of the legislature's involvement in certain litigation prosecuted or defended by the attorney general and joining decision invalidating legislature's regulation of guidance documents issued by the executive branch); Wis. Legislature v. Palm, 2020 WI 42, ¶¶122-30, 391 Wis. 2d 497, 942 N.W.2d 900 (Ann Walsh Bradley, J., dissenting) (joined by Dallet, J.) (dissenting from decision declaring Governor Evers' appointed DHS Secretary failed to follow the emergency rulemaking procedures established by the legislature and exceeded her powers in issuing order confining all people to their homes, forbidding travel and closing businesses); id., ¶¶132-63 (Dallet, J., dissenting) (joined by Ann Walsh Bradley, J.) (same); League of Women Voters of Wis. v. Evers, 2019 WI 75, ¶¶43-54, 387 Wis. 2d 511, 929 N.W.2d 209 (Dallet, J., dissenting) (joined by Ann Walsh Bradley, J.) (dissenting from decision declaring the December 2018 extraordinary session of the legislature constitutional and embracing Governor Evers' position to the contrary).

law."[3]    Gundy, 588 U.S. at 149, 156 (Gorsuch, J., dissenting).

Justice Dallet's concurrence lends credence to the Chief Justice's apprehension that four members of the majority will "restrain[] only the legislative branch" and will "aggregate power in the [] executive branch."    Dissent, ¶83.    Foreshadowing a contemporary remaking of the traditional "Schoolhouse Rock understanding of civics," Justice Dallet's concurrence, ¶62, Justice Dallet joined Justice Ann Walsh Bradley's dissent from a decision reaffirming that "when administrative agencies promulgate rules, they are exercising legislative power that the legislature has chosen to delegate to them by statute." Koschkee, 387 Wis. 2d 552, ¶12.    In her concurrence in this case, Justice Dallet declares "it is

---

[3] Justice Rebecca Frank Dallet's suggestion that the non-delegation doctrine "never existed" is plainly wrong.    Justice Dallet's concurrence, ¶72.    "Evidence of the non-delegation principle underlying the separation of powers in the Wisconsin Constitution has been well-documented by Wisconsin's seminal source for originalist constitutional interpretation." Becker v. Dane Cnty., 2022 WI 63, ¶93, 403 Wis. 2d 424, 977 N.W.2d 390 (Rebecca Grassl Bradley, J., dissenting) (citing A Convention Editorial (1846), reprinted in The Movement for Statehood, 1845–46, at 309, 310–11 (Milo M. Quaife ed., 1918)).    "The non-delegation principle traces its origins to English law." Id., ¶97 (citing Jarkesy v. SEC, 34 F.4th 446, 460 n.12 (5th Cir. 2022)). "Even the king of England, following the rise of popular sovereignty, was not permitted to transfer certain powers vested in him by Parliament." Id. (first citing Penal Statutes (1605), Coke, Reports, 7:36b–37a; and then citing Philip Hamburger, Is Administrative Law Unlawful?, at 381 (2014)).

Although Justice Dallet decries the legislature's request for what she labels a "radical[] alter[ation]" of our separation of powers doctrine, she advocates for one herself, opining that making rules governing society is somehow an executive function if a statute allows for it——or is at least a shared power.    Justice Dallet's concurrence, ¶¶67, 73.    This vision of governmental power is a contemporary invention unknown at the founding.

11

unsettled whether executive branch agencies exercise legislative power at all when they execute a statute within the bounds set by the legislature, including by making administrative rules . . . ." Justice Dallet's concurrence, ¶73. This misconception of governmental power suggests this court will stray from its ring, masquerade as the ringmaster, and expansively redraw the ring of the executive while shrinking the legislature's. See Schoolhouse Rock: Three Ring Government (ABC March 13, 1979).

¶59 The constitution cannot be construed as a one-way ratchet. The separation of powers must be maintained across the board, for both political branches irrespective of which party controls them. The constitution does not permit the legislature to wield the powers vested in the executive branch, nor does the constitution permit the legislature to cede its lawmaking authority to the executive. If this court fails to apply the separation of powers consistently, the court will compromise the structural integrity of the constitution and expose the people it protects to depredations of their liberty by facilitating the "gradual concentration of the several powers" in one branch. The Federalist No. 51, supra, at 349 (James Madison). While some members of this court may prefer (for now) the executive branch to the legislative, the constitution does not. Construing it otherwise risks the demise of our constitutional republic.

¶60 REBECCA FRANK DALLET, J. *(concurring).* I join the majority opinion and Justice Ann Walsh Bradley's concurrence. I write separately to emphasize that this case implicates only the governor's core power to faithfully execute the laws, and does not involve what we have called "shared powers" or implicate the so-called "non-delegation doctrine." No power was shared, and nothing was delegated.

I

¶61 Our constitution creates a tripartite system of government, vesting the executive power in the governor, the legislative power in the senate and assembly, and the judicial power in the court system. See Wis. Const. art. IV, § 1; art. V, § 1; art. VII, § 2. Because these powers are "conferred to a single branch by the constitution," they are the "core powers" of each branch. SEIU, Local 1 v. Vos, 2020 WI 67, ¶35, 393 Wis. 2d 38, 946 N.W.2d 35. Where core powers are concerned, the separation of powers is clear: No branch may "take [another branch's core power] up and use it as its own." Id. (quoting another source).

¶62 When only core powers are at issue, separation-of-powers questions often have clear answers. You don't need much more than a Schoolhouse Rock understanding of civics to know that the legislature can't pass a law authorizing a legislative committee to exercise the judicial power. See Schoolhouse Rock!, Three Ring Government (1979), https://www.youtube.com/watch?v=pKSGyiT-o3o ("Ring one, Executive. Two is Legislative, that's Congress. Ring three, Judiciary."). That power belongs to the judiciary. See Wis. Const. art. VII, § 2. Likewise, the legislature cannot enact

1

statutes like Wis. Stat. §§ 23.0917(6m) and 23.0917(8)(g)3., which authorize a legislative committee "to make spending decisions for which the legislature has already appropriated funds and defined the parameters by which those funds may be spent." Majority op., ¶19. That power belongs to the executive. See Wis. Const. art. V, § 1.

¶63 But it is important to emphasize that this simple, core-powers vision of the separation of powers is just the beginning, not "an ending too." See Seila Law LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 265 (2020) (Kagan, J., concurring in part). Like the United States Constitution, the Wisconsin Constitution creates a separation of powers that is, "by design, neither rigid nor complete." See id. As we have put it, "determining 'where the functions of one branch end and those of another begin' is not always easy." SEIU, 393 Wis. 2d 38, ¶34 (quoting State v. Holmes, 106 Wis. 2d 31, 42-43, 315 N.W.2d 703 (1982)). That is why we have recognized another category of governmental powers: Shared powers. Shared powers are those that "lie at the intersections of . . . core constitutional powers." State v. Horn, 226 Wis. 2d 637, 643, 594 N.W.2d 772 (1999). In these "borderlands" between the branches' core powers, we have held that each branch may exercise power "but no branch may unduly burden or substantially interfere with another branch." Id. at 644. Nothing in our decision today alters that longstanding approach to shared powers, or undermines the basic insight of our shared powers cases: That the separation of powers must have some flexibility when the powers of coordinate branches of government intersect.

2

¶64 The legislature offered two unconvincing arguments for why the authority granted to the Joint Finance Committee by §§ 23.0917(6m) and 23.0917(8)(g)3. falls within the category of shared powers. First, because DNR is an executive branch agency created by statute, the legislature asserts that both it and the governor have "inherent interests" in DNR's execution of the Knowles-Nelson program. See Wis. Stat. § 15.34 (creating DNR). And second, because DNR spends money the legislature appropriated through the Knowles-Nelson program, the legislature's appropriations power justifies its authority to review those spending decisions DNR makes.

¶65 The legislature's first argument is unpersuasive because, as we have said before, the governor "oftentimes carries out his functions through administrative agencies." SEIU, 393 Wis. 2d 38, ¶97. When he does so, those agencies are "exercising executive power," even if they were created by the legislature. Id. In other words, "the legislature does not confer on administrative agencies the ability to exercise executive power; that comes by virtue of being part of the executive branch." Id., ¶131. And as the majority opinion correctly explains, DNR is exercising core executive power when it administers the Knowles-Nelson program. See majority op., ¶¶18-19. Although the legislature has the power to create agencies and define their scope of authority, "the power to spend appropriated funds in accordance with the law enacted by the legislature" falls within the executive's core power to faithfully execute the laws. Id., ¶18.

¶66 The legislature's second argument——that its power to pass appropriations bills means that whenever DNR spends money in accordance with an appropriation, that expenditure is an exercise of shared power——is similarly unavailing. To be sure, our constitution provides that "[n]o money shall be paid out of the treasury except in pursuance of an appropriation by law." Wis. Const. art. VIII, § 2. And this provision means that the legislature has a role to play with respect to appropriations; the legislature must make "an appropriation by law." Id. But once it does so, spending money "in pursuance of" that law falls within the core executive power to faithfully execute the laws. See id.

¶67 Accepting either of the legislature's shared powers arguments would radically alter the separation of powers in Wisconsin. As we have suggested before, we would head down "a dangerous path" if we concluded that the legislature may control everything an agency or officer does simply because the legislature created that agency or officer. SEIU, 393 Wis. 2d 38, ¶131 (explaining that similar reasoning would allow the legislature to control how circuit court judges exercise their judicial power since the legislature "did not have to create the circuit court position in the first place and could eliminate it"). And it is similarly dangerous to suggest that every expenditure of state money pursuant to a lawful appropriation somehow implicates shared powers. If that were true, then even a $5 expenditure under an already enacted appropriation could be conditioned on the approval of a single member of the legislature. That cannot be, because not only would it grind government to a halt, but it would also

4

allow one branch, the legislature, to dictate how and whether other branches may exercise their core powers.

¶68 To summarize, this case doesn't involve shared powers at all. Rather, this case involves only the executive's core power to faithfully execute the laws. Because §§ 23.0917(6m) and 23.0917(8)(g)3. purport to arrogate that core power to a legislative committee, thus allowing the legislature to impede the governor's exercise of his core power, these statutes are facially unconstitutional.

II

¶69 Additionally, this case does not involve the so-called "non-delegation doctrine." Before explaining why, it is helpful first to identify what people mean when they invoke the "non-delegation doctrine." One formulation——widely accepted in our cases——is the simple inference derived from the three-branch structure of our government "that none of the three governmental powers——executive, legislative, or judicial——can be entirely delegated away from the branch to which the constitution vests it." Becker v. Dane County, 2022 WI 63, ¶30, 403 Wis. 2d 424, 977 N.W.2d 390 (lead op.) (citing In re Constitutionality of § 251.18, Wis. Statutes, 204 Wis. 501, 503, 236 N.W. 717 (1931)). In other words, our constitution does not permit, for example, the wholesale delegation of the legislative power to the governor, or the executive power to the legislature. See id.

¶70 Nevertheless, our constitution allows for some delegation of legislative authority. Klisurich v. DHSS, 98 Wis. 2d 274, 279, 296 N.W.2d 742 (1980). Indeed, "[w]e have long

5

recognized that 'the delegation of the power to make rules and effectively administer a given policy is a necessary ingredient of an efficiently functioning government.'" Koschkee v. Taylor, 2019 WI 76, ¶17, 387 Wis. 2d 552, 929 N.W.2d 600 (quoting Gilbert v. Med. Examining Bd., 119 Wis. 2d 168, 184, 349 N.W.2d 68 (1984)). In assessing whether a law delegating legislative authority to an executive branch agency violates our constitution, we "examine both the substantive nature of the granted power and the adequacy of attending procedural safeguards against arbitrary exercise of that power." Becker, 403 Wis. 2d 424, ¶31 (lead op.). So long as a legislative grant of authority contains both an "ascertainable" purpose and "procedural safeguards," it is constitutional. Klisurich, 98 Wis. 2d at 280. The upshot of these cases is that our non-delegation inquiry, like its federal equivalent, "always begins (and often almost ends) with statutory interpretation." See Gundy v. United States, 588 U.S. 128, 135 (2019) (plurality op.).

¶71 In recent years, however, some have argued that we should revisit these cases, and adopt a more restrictive version of the non-delegation doctrine that would prohibit the delegation of any legislative power to the other branches. See Becker, 403 Wis. 2d 424, ¶33 (lead op.) (rejecting such an argument with respect to delegations of local authority to local health officials). In this case, an amicus curiae argued that the governor's separation-of-powers arguments "effectively ask this Court to . . . revitalize the non-delegation doctrine——but only to the extent that it aggregates power in the executive." And in her

6

concurrence, Justice Rebecca Grassl Bradley suggests that "[t]he first principles espoused in this court's decision should revitalize the dormant non-delegation doctrine, reject the discredited notion that the 'necessities' of modern governance justify disregarding our constitution's commands, and restore our original understanding of the vesting clauses, which bar any subdelegation of the legislature's powers." Justice Rebecca Grassl Bradley's concurrence, ¶56.

¶72 This account of today's decision is incorrect, for several reasons. For starters, we cannot "revitalize" a "dormant" doctrine that never existed before. As some scholars have argued, the historical case for a more restrictive version of the non-delegation doctrine, at least at the federal level, is weak. See Julian Davis Mortenson & Nicholas Bagley, Delegation at the Founding, 121 Colum. L. Rev. 277, 279-81 (2021); but see Ilan Wurman, Nondelegation at the Founding, 130 Yale L.J. 1490, 1494 (2021) (arguing that "[a]lthough the history is messy," it supports a version of the non-delegation doctrine). Some proponents of a more restrictive version of the non-delegation doctrine nevertheless argue that "[t]he non-delegation principle traces its origins to English law," see Becker, 403 Wis. 2d 424, ¶97 (Rebecca Grassl Bradley, J., dissenting), specifically to an analogy from a supposed rule of the common law of agency that prevented agents from further delegating authority granted by their principal. See id., ¶¶96-97. But "[i]t is hard to overstate the ahistoricity of this claim," because this supposed principle of the common law of agency may never have been widely accepted and, in any event, there

7

is no evidence anyone thought the analogy to agency law should govern constitutional interpretation. See Mortenson & Bagley, supra at 297. Moreover, the historical evidence for a more restrictive non-delegation doctrine in Wisconsin is virtually non-existent. The sweeping claim that the people who drafted and ratified the Wisconsin Constitution in 1848 understood it implicitly to prohibit any delegation of authority from one branch to another one demands far more evidence than a couple of newspaper editorials in 1846 describing the legislature in passing as "agents of the people," or explaining that "[a]ll legitimate power proceeds from the people." See Becker, 403 Wis. 2d 424, ¶¶93-95 (Rebecca Grassl Bradley, J., dissenting) (quoting Taxation——Borrowing Money (1846) and A Convention Editorial (1846), reprinted in The Movement for Statehood, 1845-46, at 179, 310 (Milo M. Quaife, ed. 1918)). Given the lack of historical evidence in Wisconsin supporting a more restrictive version of the non-delegation doctrine, it should not be a surprise that we have "never interpreted" the Wisconsin Constitution "in a literal sense to bar the delegation of any legislative power outside the senate and assembly." Becker, 403 Wis. 2d 424, ¶30 (lead op.).

¶73 But putting history aside, the substantive case for a more restrictive version of the non-delegation doctrine is also weak under the Wisconsin Constitution. All our constitution says is that the legislative, executive, and judicial powers are vested in each respective branch of government. See Wis. Const. art. IV, § 1; art. V, § 1; art. VII, § 2. It contains no express limitation on delegations of that authority; the non-delegation doctrine is

8

simply an inference from our constitutional structure. Moreover, it is unsettled whether executive branch agencies exercise legislative power at all when they execute a statute within the bounds set by the legislature, including by making administrative rules pursuant to legislative authorization. Even if agencies do, however, "exercise both executive and legislative powers" in such circumstances, see SEIU, 393 Wis. 2d 38, ¶130, a more restrictive version of the non-delegation doctrine may nevertheless be in tension with our shared powers cases. See Horn, 226 Wis. 2d at 643-44. If administrative agencies exercise shared powers without "unduly burden[ing] or substantially interfer[ing] with another branch," there is no separation-of-powers problem. Id. at 644.

¶74 But more fundamentally, accepting the governor's position in this case does not implicate any version of the non-delegation doctrine, let alone a more restrictive one. Sections 23.0917(6m) and 23.0917(8)(g)3. purport to claim a power for the Joint Finance Committee that was never the legislature's to begin with: The executive power to faithfully execute the law. "The legislature cannot delegate a power it does not have."[1] Panzer v. Doyle, 2004 WI 52, ¶61, 271 Wis. 2d 295, 680 N.W.2d 666, abrogated on other grounds by Dairyland Greyhound Park, Inc. v. Doyle, 2006

---

[1] Moreover, to the extent our cases have ever been concerned with delegations of authority from one branch to another it has been the legislature delegating some of its power to the executive or the judiciary. See, e.g., Klisurich, 98 Wis. 2d at 279-80; Panzer v. Doyle, 2004 WI 52, ¶¶53-58, 271 Wis. 2d 295, 680 N.W.2d 666, abrogated on other grounds by Dairyland Greyhound Park, Inc. v. Doyle, 2006 WI 107, 295 Wis. 2d 1, 719 N.W.2d 408; Town of Beloit v. City of Beloit, 37 Wis. 2d 637, 643-45, 155 N.W.2d 633 (1968).

WI 107, 295 Wis. 2d 1, 719 N.W.2d 408. And for that reason, this case doesn't involve the non-delegation doctrine at all.

\* \* \*

¶75 I conclude by addressing a disturbing aspect of some recent opinions in our court, which level accusations of bad faith and bias against my colleagues and me. Here, we have two separate writings that do so. In her dissent, Chief Justice Ziegler stoops to accusations of bad faith and political bias rather than engage in a reasoned debate about the law. And Justice Rebecca Grassl Bradley can't pass up an opportunity to join in. In a bizarre twist, she writes separately to accuse the very justices who join her majority opinion of doing so only for political reasons.

¶76 At best, these writings are a distraction from what should be the focus. Today, we reached a nearly unanimous conclusion that §§ 23.0917(6m) and 23.0917(8)(g)3. violate the separation of powers enshrined in our constitution. This case illustrates how we can reach consensus, even when weighty issues are involved.

¶77 Perhaps it is inevitable that some will mistake our decisions simply as "wins" for one set of political interests over another. But Wisconsin Supreme Court Justices should not fuel those misperceptions with headline-seeking rhetoric. Doing so undermines the rule of law and harms both this institution and our state. We are all judges committed to fairly, neutrally, and impartially considering the issues before us without prejudgment and rendering decisions that follow the law, not the party line.

No one——least of all other members of this court——should suggest otherwise.

¶78  I am authorized to state that Justices ANN WALSH BRADLEY, JILL J. KAROFSKY, and JANET C. PROTASIEWICZ join this opinion.

11

¶79 ANNETTE KINGSLAND ZIEGLER, C.J. *(dissenting).* As was said in the dissent to the order granting this petition for original action, this case "raises substantial questions about the proper roles of the executive and legislative branches under the Wisconsin Constitution."[1] There is no doubt that the legal questions presented in this case affect matters of statewide importance,[2] but there is no emergency here, nor was there a need to fast-track just one issue in the case——a challenge to the Knowles-Nelson Stewardship Program, outlined in Wis. Stat. § 23.0917 and administered through the Department of Natural Resources ("DNR").[3] In this one of three issues handpicked by four members of the court, we have been asked to decide whether the Wisconsin Legislature's Joint Committee on Finance's ("JFC") vetoes of the DNR's choices relating to the Knowles-Nelson

---

[1] Order granting petition for original action, <u>Evers v. Marklein</u>, No. 2023AP2020-OA, unpublished order (Wis. Feb. 2, 2024), at 4 (Hagedorn, J., dissenting).

[2] Legal questions which affect matters of statewide importance are traditionally a prerequisite for this court to accept a case. <u>See</u> Wis. Stat. § (Rule) 809.62(1r):

> CRITERIA FOR GRANTING REVIEW. Supreme court review is a matter of judicial discretion, not of right, and will be granted only when special and important reasons are presented. The following, while neither controlling nor fully measuring the court's discretion, indicate criteria that will be considered:
>
> (a) A real and significant question of federal or state constitutional law is presented.

§ (Rule) 809.62(1r)(a).

[3] <u>Marklein</u>, No. 2023AP2020-OA, unpublished order, <u>supra</u> n.1, at 1.

1

Stewardship program, which vetoes are authorized by § 23.0917(6m) and (8)(g)3., facially violate the separation of powers. "As is often the case with original-jurisdiction petitions, the question is not whether we can grant the petition but whether we should." Johnson v. Wisconsin Elections Comm'n, No. 2021AP1450-OA, unpublished order, at 14 (Wis. Sept. 22, 2021) (Dallet, J., dissenting from grant of petition for original action). Here, the issues, together, should be fully vetted.[4]

---

[4] In this one case, there are three issues. Four members of the court selected one issue to decide, leaving the following two issues "held in abeyance pending further order of the court":

[Issue 2] Wisconsin's biennial budget bill, 2023 Wis. Act 19, provides a pay adjustment for [University of Wisconsin (UW)] and all other state employees. Again, courts have universally recognized that spending appropriated funds is an executive power and that legislative committees cannot block the executive's exercise of that power. Wisconsin Stat. § 230.12(3)(e)1. authorizes the Joint Committee on Employment Relations, an eight-member legislative committee, to veto UW's pay adjustments. Does this veto provision facially violate the separation of powers?

[Issue 3] Under various provisions of Wis. Stat. ch. 101, [Department of Safety and Professional Services (DSPS)] is charged with promulgating rules relating to commercial building safety, accessibility, and energy efficiency. Under Wis. Stat. § 457.03(2), the Marriage and Family Therapy, Professional Counseling, and Social Work Examining Board is responsible for developing ethics standards for social workers, marriage and family therapists, and professional counselors. Courts have broadly recognized that blocking executive branch agencies' rules violates bicameralism and presentment procedures and infringes on executive and judicial authority. Wisconsin Stat. §§ 227.19(5)(c), (d), (dm), and 227.26(2)(d) and (im) authorize the Joint Committee for Review of Administrative Rules, a 10-member legislative committee, to veto administrative rules. Do these veto provisions violate the separation of powers by allowing this committee to block executive agency

2

¶80 As stated in the dissent to the order accepting this petition:

> Under current law, the [JFC] has reviewed gubernatorial appropriations under the Knowles-Nelson Stewardship Program (the Program) for more than fifteen years. 2007 Wis. Act 20, § 646t; Wisconsin Legislative Fiscal Bureau, <u>Warren Knowles-Gaylord Nelson Stewardship Program</u> (Informational Paper # 61, prepared by Eric Helper, Jan. 2019). The Governor suddenly asserts this legislative oversight of appropriations under the Program violates the separation of powers doctrine and urgently warrants this court invoking its original

---

> rulemaking or, at minimum, DSPS's and the Board's rulemaking authority over commercial building standards and ethics standards for social workers, marriage and family therapists, and professional counselors?

> Interestingly, employing the opposite approach, those four members of the court recently granted two separate cases, with separate issues therein, to be decided together even though normally one would be held in abeyance. <u>See</u> <u>Kaul v. Urmanski</u>, No. 2023AP2362, unpublished order (Wis. July 2, 2024) (granting petition for bypass), and <u>Planned Parenthood v. Urmanski</u>, No. 2024AP330-OA, unpublished order (Wis. July 2, 2024) (granting petition for original action). As to these two separate cases, Justice Karofsky tried to justify this disparate treatment, stating:

> > Here, the court is granting a petition whose resolution may depend on how we rule in another case . . . . [I]t is not particularly groundbreaking for this court to schedule two cases with interdependent issues at the same time. . . .

> > The court does not know how it should resolve a particular case until it reviews all of the arguments made by the parties. <u>Consequently, it makes good sense to hear all of the relevant legal arguments before rendering a decision</u> . . . .

<u>Planned Parenthood</u>, No. 2024AP330-OA, unpublished order at 4 (Karofsky, J., concurring) (emphasis added). For the new majority, different principles apply depending on whether a "pet issue" is at stake. <u>Planned Parenthood</u>, No. 2024AP330-OA, unpublished order at 11 (Hagedorn, J., dissenting).

3

> jurisdiction. The timing is no coincidence; the Governor knows he has a friendly foursome standing by to do his bidding.

Evers v. Marklein, No. 2023AP2020-OA, unpublished order (Wis. Feb. 2, 2024), at 2-3 (Rebecca Grassl Bradley, J., dissenting). Here, "[i]nvoking our original jurisdiction sets this court on a perilous path to resolve interbranch disputes whenever the Governor complains the Legislature is hindering his policy agenda." Id. at 3.

¶81 Nonetheless, and despite the strong dissent of three of their colleagues, four members of the court handpicked but one issue to fast-track and decide.[5] I dissented then, and I dissent now. Consistency has not always been the new majority's strong suit, but when it comes to picking political favorites, they have been unwaveringly faithful to the cause.[6] Instead of allowing this

---

[5] This term, four members of the court have established a consistent record of handpicking and fast-tracking certain political "pet issues"——issues such as redistricting, absentee voting, ballot box use, and abortion. See, e.g., Clarke v. Wisconsin Elections Comm'n, 2023 WI 79, ¶¶78-184, 410 Wis. 2d 1, 998 N.W.2d 370 (Ziegler, C.J., dissenting) (redistricting); Brown v. Wisconsin Elections Comm'n, No. 2024AP232, unpublished order (Wis. May 3, 2024) (absentee voting practices); Priorities USA v. Wisconsin Elections Comm'n, No. 2024AP164, unpublished order (Wis. Mar. 12, 2024) (ballot drop boxes); Planned Parenthood, No. 2024AP330-OA, unpublished order supra n.4 (abortion).

[6] See Clarke, 410 Wis. 2d 2, ¶¶78-184 (Ziegler, C.J., dissenting); Brown v. Wisconsin Elections Comm'n, No. 2024AP232, unpublished order (Wis. Jun. 11, 2024) (Rebecca Grassl Bradley, J., dissenting to grant of motion for stay (in part) pending appeal); Brown, No. 2024AP232, unpublished order supra n.5, at 4-10 (Ziegler, C.J., dissenting to grant of petition for bypass); Priorities USA v. Wisconsin Elections Comm'n, No. 2024AP164, unpublished order (Apr. 18, 2024), at 2 (Hagedorn, J., dissenting to grant of Governor's motion to intervene); Priorities USA, No. 2024AP164, unpublished order supra n.5, at 2-6 (Rebecca Grassl Bradley, J., dissenting to grant of petition for bypass).

case to proceed through the process, sifting and winnowing the issues, and then taking all the issues at the same time, which would serve to produce consistency, they forge on. Selecting an issue that only impacts the Republican-controlled legislature and the longstanding Knowles-Nelson Stewardship Program should raise eyebrows. Determining all issues at the same time could serve to hold my colleagues to application of the same principles in the same way, even when it comes to a Democratic-controlled branch of government. Unfortunately, we will wait to see if that consistency will be forthcoming, as the majority handpicked and now limits only the legislative branch's longstanding, statutorily authorized practice.

¶82 Simply stated, there is no good reason why those four members of the court gave preferential selection to part of this case, fast-tracking only one of the three issues, rushing to decide that lone issue, which just happens to limit legislative power only. What's the rush? There is absolutely no good reason to have handpicked this case and this one issue, ahead of all the other cases, taking it out of turn, and placing it to the front of the line. That is not our usual practice, nor should it be. We should not be picking favorites and delivering results.

¶83 As to the merits of this case, I recognize that the majority opinion has cabined its analysis to separation of powers principles and concludes that the legislative branch cannot exercise a core power of the executive branch. I raise concern about deciding this one issue alone, applying these principles to the legislature only. At least two of my colleagues would not

5

have decided this one issue alone in this case at this time.[7] If this becomes a singular application of separation of power principles or the non-delegation doctrine, which restrains only the legislative branch, that amounts to aggregation of power which runs counter to fundamental constitutional principles. The principles the majority applies today must have consistent application, which could have been more even-handedly accomplished by hearing all the issues in due course. Because this sole issue is being decided in a vacuum and on an expedited basis, we are at risk of seeing a selective application of separation of power and non-delegation principles and, ultimately, imbalance between the branches. The petitioners[8] effectively ask this court to revitalize separation of powers and the non-delegation doctrine, but as applied to the Republican-controlled branch only. This limited application could ultimately serve to aggregate power in the Democratic-controlled executive branch. Without considering all issues together and in due course, the doctrine may be applied

---

[7] See Marklein, No. 2023AP2020-OA, unpublished order supra n.1, at 2 (Rebecca Grassl Bradley, J., dissenting) ("By accepting only one of the issues raised by the Governor and holding the other two issues in abeyance, the majority refashions this court as the Governor's avenue for imposing policy changes without the consent of the governed. When the majority's political allies say jump, the new majority responds: 'How high?'"); see also Marklein, No. 2023AP2020-OA, unpublished order supra n.1, at 5 (Hagedorn, J., dissenting) ("Letting a case mature through the normal process is not the only reason we should exercise caution here. This claim involves a power struggle between the executive and legislative branches. . . . Because the court here enters the fray too quickly, we risk further incentivizing what Justice Scalia called the 'overjudicialization of the process of self-governance[.]'").

[8] In this instance, "the petitioners" refers to Governor Tony Evers and Gathering Waters, Inc.

6

inconsistently. Here, because one issue is being taken up in a vacuum, handpicked for quick "justice," we have no assurance that constitutional principles, whether separation of powers or non-delegation doctrine principles, will be equally applied, in the same manner, across the board, to the other branches in the future. For that, we wait. Those issues were not fast-tracked for decision this term.

¶84 Instead, my colleagues who accepted this case for review and then accepted only one limited issue, fail to "see the prudence of patience and humility" and the worth of proceeding cautiously.[9] The statutory authority that the JFC has retained over the Knowles-Nelson Stewardship Program complies with bicameralism and presentment requirements,[10] as the JFC's authority to review expenditures was voted on by the entire legislature and signed by the governor. The decision the court makes today limits only the Republican legislature's continued control over already allocated money——a longstanding practice. Having said that, no relief appears to exist for the legislature to claw back appropriations that it may not have allocated if it knew that it would lose any

---

[9] Marklein, No. 2023AP2020-OA, unpublished order supra n.1, at 5 (Hagedorn, J., dissenting).

[10] The Wisconsin Constitution does differ from the United States Constitution. The Wisconsin Constitution requires "[e]very bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor." Wis. Const. art. V, § 10(1)(a). The United States Constitution requires "[e]very order, resolution, or vote" to be presented to the President. U.S. Const. art. I, § 7. Our court should not be so quick to determine that the Wisconsin Constitution requires presentment in the same manner, as the language of the Wisconsin Constitution appears to be more limited.

ability to ensure the expenditures were being made appropriately. Government tends to spend what it has been allocated, and this procedure provided a check on that spending.

¶85 The majority does not grapple with the unintended consequences of this ruling. Consequential reasoning is not necessarily legal reasoning, but there are likely practical implications. An unintended consequence might be that this opinion could be used to impact other longstanding practices, even though this opinion is limited to this one program. Another unintended consequence may be that the legislature will proceed quite differently in its decision making and allocations. For example, the legislature could decide that it will no longer allocate funds to the longstanding and respected Knowles-Nelson Stewardship Program. This could result in less, not more, allocations for important projects, like those accomplished by the Knowles-Nelson Stewardship Program. The legislature may need to, more formally and less efficiently, address funding of individual worthy projects, because continued control of the purse has been limited.

¶86 More specifically with respect to the issue at hand, I lament how handpicking this lone issue has the appearance of being

8

just one more in a series of political "power grabs."[11]  Why now is it so important to put a stop to this decades' long practice? For decades, the legislature has used joint committees, like this one, to review actions by the governor and state agencies.  This practice has been approved, tacitly or explicitly, by all three branches of government:  the legislative, executive, and judicial branches.  The statutes at issue were passed by the legislature and signed by the governor and each branch operated pursuant to them.  These practices were cloaked with judicial approval.

¶87  In J.F. Ahern Co. v. Wisconsin State Building Comm'n, 114 Wis. 2d 69, 336 N.W.2d 679 (Ct. App. 1983), the court of appeals unanimously determined that it was not a violation of Wisconsin's separation of powers doctrine to allow a legislative committee such as the JFC——in this instance, the State Building

---

[11] See Clarke, 410 Wis. 2d 1, ¶¶78-184 (Ziegler, C.J., dissenting); Statement of Chief Justice Annette Kingsland Ziegler (Aug. 2, 2023), https://www.wispolitics.com/2023/chief-justice-annette-kingsland-ziegler-statement/; Press Release, Chief Justice Annette Kingsland Ziegler (Aug. 4, 2023), https://www.wicourts.gov/news/archives/view.jsp?id=1578&year=202 3; Clarke v. Wisconsin Elections Comm'n, No. 2023AP1399-OA, published order (Wis. Oct. 6, 2023), at 34-35 (Hagedorn, J., dissenting to grant of petition for leave to commence original action) (noting that in spite of petitioners "standing by until the court's composition changed, the court dutifully adopts an accelerated briefing and oral argument schedule.  It even changed our internal writing deadlines on original actions to ensure this case would be fast-tracked"), https://www.wicourts.gov/courts/supreme/origact/docs/23ap1399_10 06order.pdf; see also ¶83 n.7, supra.

Commission[12]——to "exercise executive powers to the exclusion of the executive branch." J.F. Ahern Co., 114 Wis. 2d at 108. The court determined the Commission's "apparent ability to exclude the executive branch from exercise of its own powers does not . . . necessarily violate the separation doctrine . . . ." Id. Rather, "[a] practical requirement of unanimity between the legislative members of the Building Commission, on the one hand, and the governor, on the other, therefore exists. That compulsory unanimity converts the shared power over building construction into a cooperative venture between the two governmental branches." Id. Our court did not overturn that decision until now, over 40 years later. For decades, the legislative and executive branches relied on those principles and complied with them.

¶88 In Martinez v. DILHR, 165 Wis. 2d 687, 478 N.W.2d 582 (1992), our court unanimously held it was constitutional for the joint legislative committee to suspend agency rules. Martinez, 165 Wis. 2d at 699-700. J.F. Ahern Co. was cited with approval. See id. at 697 (citing J.F. Ahern Co., 114 Wis. 2d at 88) ("Legislative power may be delegated to an administrative agency as long as adequate standards for conducting the allocated power are in place."). The legislature is endowed with constitutional authority to manage the public fisc and has the constitutional

---

[12] The State Building Commission is a legislative committee, "controlled by six legislators," which "shares executive powers with the governor and one voting citizen member appointed by the governor." J.F. Ahern Co. v. Wisconsin State Building Comm'n, 114 Wis. 2d 69, 106-07, 336 N.W.2d 679 (Ct. App. 1983). The Building Commission, among other things, controls construction contracts for the construction of state office buildings.

10

power of the purse.[13] The JFC has operated as a vehicle for the legislature to remain "accountable" for governing the public fisc and to "check on the activities of non-elected agency bureaucrats." Martinez, 165 Wis. 2d at 701.[14]

¶89 The court pays little heed to the doctrine of stare decisis when it reaches its conclusions and technically it need not with respect to a court of appeals decision. Although the majority reverses a court of appeals case rather than our

---

[13] See Wis. Const. art. VIII, § 2 ("No money shall be paid out of the treasury except in pursuance of an appropriation by law."); see also Wis. Const. art. VIII, § 5 ("The legislature shall provide for an annual tax sufficient to defray the estimated expenses of the state for each year; and whenever the expenses of any year shall exceed the income, the legislature shall provide for levying a tax for the ensuing year, sufficient, with other sources of income, to pay the deficiency as well as the estimated expenses of such ensuing year.").

[14] Martinez v. DILHR, 165 Wis. 2d 687, 478 N.W.2d 582 (1992), is a "horizontal precedent" which binds this court, absent a showing of a special justification for overruling it. It is not overturned by the majority. See Bryan A. Garner, et al., The Law of Judicial Precedent 35 (2016) (Horizontal Precedents) ("A high court . . . generally adheres to horizontal precedents——namely, its own earlier decisions. But if there is a special justification to depart from or overrule precedent, a full court may overturn its own prior decision."); see also Johnson Controls, Inc. v. Emp. Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257; State v. Johnson, 2023 WI 39, ¶¶19-20, 407 Wis. 2d 195, 990 N.W.2d 174; State v. Young, 2006 WI 98, ¶51 n.16, 294 Wis. 2d 1, 717 N.W.2d 729. Adherence to precedent is "the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." Payne v. Tennessee, 501 U.S. 808, 827 (1991); see also Johnson Controls, Inc., 264 Wis. 2d 60, ¶95; Progressive N. Ins. Co. v. Romanshek, 2005 WI 67, ¶41, 281 Wis. 2d 300, 697 N.W.2d 417 ("Any time this court is asked to overturn a prior case, we must thoroughly consider the doctrine of stare decisis.").

precedent, all three branches of government have engaged in the longstanding practices of the JFC. Given the longstanding practice recognized and approved by all three branches of government and cited with approval in Martinez, 165 Wis. 2d at 697, it seems fair to at least talk about stare decisis principles. We "repeatedly recognized the importance of stare decisis to the rule of law." State v. Johnson, 2023 WI 39, ¶19, 407 Wis. 2d 195, 990 N.W.2d 174. We "follow[] the doctrine of stare decisis scrupulously . . . ." State v. Luedtke, 2015 WI 42, ¶40, 362 Wis. 2d 1, 863 N.W.2d 592 (quoting Johnson Controls, Inc. v. Emp. Ins. of Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257).[15]

---

[15] J.F. Ahern Co., 114 Wis. 2d 69, is a court of appeals decision which generally this court is neither bound by nor needs special justification to overturn. See Cook v. Cook, 208 Wis. 2d 166, 189-90, 560 N.W.2d 246 (1997) (determining that this court "has the power to overrule, modify, or withdraw language from a published opinion of the court of appeals"); see also State v. Johnson, 407 Wis. 2d 195, ¶20 ("[W]e have never required a special justification to overturn a decision of the court of appeals."). Nonetheless, stare decisis principles are worth noting. "[A]ny departure from the doctrine of stare decisis demands special justification." Johnson Controls, Inc., 264 Wis. 2d 60, ¶94; see also State v. Johnson, 407 Wis. 2d 195, ¶19; Young, 294 Wis. 2d 1, ¶51 n.16; Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266. These special justifications include:

(1) the law has changed in a way that undermines the prior decision's rationale; (2) there is a "need to make a decision correspond to newly ascertained facts;" (3) our precedent "has become detrimental to coherence and consistency in the law;" (4) the decision is "unsound in principle;" or (5) it is "unworkable in practice."

State v. Johnson, 407 Wis. 2d 195, ¶20 (citing Young, 294 Wis. 2d 1, ¶51 n.16).

12

¶90 Unfortunately, facilitating inconsistency in the law, as has been the practice of the new majority, does not put the state of Wisconsin on better footing. While I recognize that the court declares this JFC review to be unconstitutional because it violates separation of powers, stare decisis principles are absent and overturning case law has been wrongly based on mere disagreement with a prior decision. See Clarke v. Wisconsin Elections Comm'n, 2023 WI 79, ¶¶78-184, 410 Wis. 2d 1, 998 N.W.2d 370 (Ziegler, C.J., dissenting) (redistricting); see also, State v. Roberson, 2019 WI 102, ¶97, 389 Wis. 2d 190, 935 N.W.2d 813 (Dallet, J., dissenting) (quoted source omitted) ("The outcome of a case should not turn on whether the current members of the court find one legal argument more persuasive but, rather, on '"whether today's [majority] has come forward with the type of extraordinary showing that this court has historically demanded before overruling one of its precedents."'"); Ramos v. Louisiana, 590 U.S. 83, 121-22 (2020) (Kavanaugh, J., concurring in part) ("A garden-variety error or disagreement does not suffice to overrule. In the view of the Court that is considering whether to overrule, the precedent must be egregiously wrong as a matter of law in order for the Court to overrule it.").

¶91 For over a century, the JFC has been an important part of how allocations in Wisconsin are managed. This longstanding review structure allowed joint legislative committees to approve or reject important matters. The JFC reviews certain limited expenditures by the DNR to address the Knowles-Nelson Stewardship Program. For decades, the JFC has been a fundamental part of

13

governmental structure in Wisconsin. While application of separation of power principles are the basis for the court's conclusion that the JFC's authority to review DNR spending decisions is unconstitutional, we know not the other implications of this decision even though the majority limits its decision to the one issue selected——the Knowles-Nelson Stewardship Program. That program and the JFC have long functioned in a fundamental and important way to allow review and decision making regarding fiscal expenditures.

¶92 The JFC is a statutory standing committee, constituted under the Wisconsin Legislature. The JFC exists to review all state appropriations and revenues, including the governor's recommended budget and other fiscal bills, as well as providing supplementation of agency appropriations. The JFC also is empowered to attach an emergency clause to any appropriation bill decreasing state revenues or increasing the cost of state government in advance of the budget bill. The JFC acts upon agency requests for changes in their authorized position levels, as most of those positions are provided for through the biennial budget. Additionally, the JFC has many other statutory duties, which while not at issue in this case, are nonetheless instructive of how

14

essential the JFC is.[16]  The JFC is one of several legislative committees, but given its role, it is an important one.  Ever since its initial iteration in 1911, the JFC and its oversights have long provided guidance and checks on programs that have the potential for huge economic outlay.

¶93  The decision of the court today, despite being limited to this particular program and based on separation of power principles, could be perceived as having broader impact on the way Wisconsin government has managed the power of the purse for over 100 years.  All three branches of government have functioned with the understanding that the JFC operates with authority to review certain spending and in fact, that review has been deemed constitutional by our court.  The other branches of government have implicitly and explicitly approved such JFC review.  If the

---

[16] The list of statutory sections implicated by the JFC's approval is non-exhaustive, and the JFC's reach is broad:  The JFC is responsible for reviewing, submitting recommendations to, and advising and approving programs and monies in categories such as Natural Resources (the Program at issue here); Administration; Agriculture, Trade and Consumer Protection; Building Commission; Child Abuse and Neglect Prevention Board; Children and Families; Corrections; Distance Learning Authorization Board; Educational Communications Board; Elections Commission; Employee Trust Funds; Financial Institutions; Health Services; Higher Educational Aids Board; Historical Society; Housing and Economic Development Authority; Insurance; Judicial Commission; Justice; Military Affairs; Public Instruction; Revenue; Safety and Professional Services; Tourism; Transportation; University of Wisconsin Hospitals and Clinics Authority; University of Wisconsin System; Wisconsin Aerospace Authority; Wisconsin Economic Development Corporation; Workforce Development, among other things.  Additionally, many of these same agencies and boards are statutorily required to submit reports to, and appear before, the JFC.  Joint Committee on Finance Informational Paper #78, Legislative Fiscal Bureau (Jan. 2021).

court is "declaring rights," it should consider how it might do so for the next budget cycle, as no other relief seems available for the past. Allowing the case to proceed in accordance with our standard practice and not rushing to judgment on this one issue, would have been the most practical way to give notice to the legislature of this groundbreaking change. Proceeding through the normal process, would more fairly have provided the legislature the ability to plan for the next budget cycle. Instead, they may be without any relief for certain past allocations that are no longer under their control.

¶94 In short, I disagree with rushing to judgment, on this limited issue, taking this case out of turn. There is simply no need.

¶95 As a result, I respectfully dissent.